**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| JAVIER MORTON,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No.:<br><br>VERIFIED COMPLAINT |

**VERIFIED COMPLAINT FOR**
**INJUNCTIVE AND DECLARATORY RELIEF**

Plaintiff Javier Morton ("Morton" or "Plaintiff"), by and through undersigned counsel, hereby files this Verified Complaint for Injunctive and Declaratory Relief against Defendant National Collegiate Athletic Association ("NCAA" or "Defendant") and respectfully alleges as follows:

## NATURE OF THE ACTION

1. Plaintiff Javier Morton brings this action against Defendant NCAA to challenge NCAA Division I Bylaws 12.02.6, 12.8, 12.8.1, 12.8.1.1, 12.8.3.1, and 14.3.3 (the "JUCO Eligibility Limitation Bylaws" or "Challenged Bylaws").[1] These NCAA Bylaws arbitrarily and disparately reduce the number of seasons former junior college ("JUCO") football players can play Division I NCAA football after transferring to a Division I school. In doing so, the Challenged Bylaws unjustifiably and unlawfully restrain the ability of JUCO transfer athletes to earn money at NCAA schools through use of their name, image, and likeness ("NIL") and through revenue-sharing payments now permitted under the *House v. NCAA*

---

1. The 2025-26 NCAA Division I Manual renumbered the Challenged Bylaws by moving the competition provisions from Article 12.8 to Article 12.6 and the intercollegiate definition from 12.02.6 to 12.02.3. These shifts followed the *House v. NCAA* settlement elimination of several intervening amateurism provisions from Article 12. However, the operative text of each Challenged Bylaw remains substantively unchanged. (Ex. A, NCAA Bylaws.)

settlement, In re College Athlete NIL Litig., 2025 WL 1675820 (N.D. Cal. June 6, 2025) ("House") — a market that now exceeds $2.75 billion annually, with $1.95 billion flowing directly to athletes. (Opendorse NIL Reports, Ex. C, P21.) Plaintiff seeks declaratory and injunctive relief against Defendant for violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, tortious interference with prospective economic advantage, and breach of contract.

2. In a landmark 2021 decision, a unanimous United States Supreme Court determined that NCAA Bylaws setting restrictions on college athlete compensation are subject to antitrust scrutiny, holding that the NCAA and its Division I member institutions violated the Sherman Act by creating unlawful horizontal restraints — agreements among competitors on the way in which they will compete with one another — on the labor market for college athletes. *NCAA v. Alston*, 594 U.S. 69 (2021). Following *Alston*, the NCAA lifted its prohibition on athletes receiving NIL compensation. In the years since, the NIL market has grown to $2.75 billion annually and further litigation against NCAA Bylaw restrictions has ensued. (Opendorse NIL Reports, Ex. C, P21.) In addition, the *House v. NCAA* settlement, approved in 2025, established direct revenue-sharing payments of up to $20.5 million per school per year, with the total settlement value exceeding $2.8 billion. (House Settlement, Ex. D.) These NIL and revenue-sharing opportunities are only available to NCAA Division I athletes. Athletes competing at junior colleges governed by the National Junior College Athletic Association ("NJCAA") — an organization with zero NCAA affiliation — have no access to these markets.

3. Even so, the JUCO Eligibility Limitation Bylaws restrict the ability of athletes who begin their college football careers at junior colleges from having the same opportunity to compete and earn as athletes who enter an NCAA institution as freshmen. Specifically, the Challenged Bylaws count competition at non-NCAA

junior colleges as "intercollegiate competition," start the eligibility clock at JUCO enrollment, and independently cap JUCO transfers at three Division I seasons — limiting them to two or three seasons of Division I football, as opposed to the four seasons available to every other Division I football player. In contrast, the NCAA does not similarly penalize athletes who first competed in other non-NCAA settings. Athletes who serve in the military, compete for a prep school, participate in certain semi-professional organizations, or play in a professional league before pursuing collegiate athletics in another sport do not lose out on all four years of valuable Division I competition, income, exposure, and education. See NCAA Bylaw 12.6.1.2. (NCAA Bylaws, Ex. A.)

4. The JUCO Eligibility Limitation Bylaws neither promote competition nor benefit athletes. These rules stifle competition in the labor market for NCAA Division I football players by categorically excluding an entire class of JUCO transfer athletes from the market, suppressing their compensation to zero for the excluded seasons, and degrading the quality of Division I football consumed by the public. These harms are contrary to the NCAA's stated mission of promoting the well-being of college athletes and are the very ills federal antitrust law seeks to remedy. Because college athletes cannot relive their athletic careers, the harm inflicted by the Challenged Bylaws is irreparable and ongoing, and injunctive relief is necessary.

5. Courts across the country have recognized these rules as anticompetitive and unlawful under the Sherman Antitrust Act. *See Pavia v. NCAA*, 760 F. Supp. 3d 527 (M.D. Tenn. 2024); *Martinson v. NCAA*, 804 F. Supp. 3d 1109 (D. Nev. 2025); *Robinson v. NCAA*, 803 F. Supp. 3d 481 (N.D. W. Va. 2025);*Blythe v. NCAA*, No. 3:26-cv-100 (D. Nev. Feb. 20, 2026); *Moore v. NCAA*, No. DC-25-13153 (134th Dist. Ct., Tex. Aug. 13, 2025); *Grant-Foster v. NCAA*, No. 2520

5060-32 (Spokane Super. Ct., Wash. Oct. 27, 2025). The NCAA has opposed injunctions in every case, appealed every adverse ruling, and continues to do so.

6. Morton — a JUCO transfer, two-year Division I starter, and team captain whose fourth season is foreclosed by the Challenged Bylaws — brings this action to stop the unlawful eligibility rules that are currently preventing him from competing for a Division I institution for the 2026-27 season in violation of federal antitrust laws. The Challenged Bylaws' ineligibility designation prevents Morton from entering the NCAA Transfer Portal, forecloses both his collegiate and professional career paths, and extinguishes the documented economic opportunities set forth herein. Morton seeks to restore freedom of economic opportunity for himself and other JUCO transfer football players.

## JURISDICTION & VENUE

7. This Court has jurisdiction over this action under Section 1 of the Sherman Act, 15 U.S.C. § 1, Sections 4 and 26 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and under 28 U.S.C. §§ 1331 and 1337. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

8. This Court may exercise personal jurisdiction over Defendant NCAA because Defendant currently transacts business in the Northern District of Georgia. Defendant and its member institutions conduct athletic competitions, ticket and merchandise sales, television agreements, and other revenue-generating activities in this district, including through member institutions like Georgia Tech and Georgia State University, and through events such as the NCAA Tournament and College Football Playoff hosted in Atlanta. The NCAA's anticompetitive conduct directly affects the economic interests of Plaintiff, who is a resident of this district.

9. Venue is proper in the Northern District of Georgia under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391(b)(2).

## THE PARTIES

### I. Plaintiff Morton

10. Plaintiff Javier Morton (DOB: May 25, 2002) is a citizen and resident of the State of Georgia, residing in Stone Mountain, Georgia, in DeKalb County, within the Northern District of Georgia. Morton is a safety, standing 6'2" and weighing 195 pounds. He is currently enrolled at Temple University in Philadelphia, Pennsylvania, a Division I institution in the American Athletic Conference and a member of the NCAA. Morton is not currently listed in the NCAA Transfer Portal; the indeterminacy of his eligibility status — created by the Challenged Bylaws — prevents him from entering the portal because he cannot represent himself as eligible to transfer institutions without resolution of his JUCO eligibility dispute. (Morton Decl., Ex. B.)

11. Morton was a four-star recruit out of Stephenson High School in Stone Mountain, Georgia, rated as one of the top 35 safety recruits in his class and originally committed to the University of Alabama. However, due to academic needs, Morton enrolled at Garden City Community College in June 2021 ("Garden City CC"), a member of the National Junior College Athletic Association ("NJCAA") and the Kansas Jayhawk Community College Conference ("KJCCC"). At Garden City CC, Morton played one season of JUCO football and met all NCAA academic qualifications. Morton then transferred to the University of Nebraska in 2022, where he played his first season of NCAA Division I football season before being red shirted during the next season. He then transferred to Temple University in 2024, where he became a two-year starter, lettered in both seasons, and was named a team captain in 2025. Morton is on track to graduate in May 2026 with a Bachelor of Arts degree in Adult Learning, Training and Organizational Development from Temple. At present, Morton is simultaneously seeking to regain NCAA eligibility for the 2026-27 football season as a graduate

student athlete — either to return to Temple or transfer to another DI institution — while also preparing for the upcoming 2026 NFL Draft as he is currently precluded from a fourth season of NCAA football. (Morton Decl., Ex. B.)

**II. <u>Defendant NCAA</u>**

12. Defendant NCAA is an unincorporated association headquartered at 700 W. Washington Street, P.O. Box 6222, Indianapolis, Indiana 46206-6222, that acts as the governing body of college sports. The NCAA was founded in 1905 as a nonprofit organization whose stated mission is to "provide student-athletes with the opportunity to participate in sports and compete as a vital, co-curricular part of their educational experience." (NCAA Bylaws, Ex. A.) The NCAA includes more than 1,100 member colleges and universities throughout the United States. These member institutions are organized into three divisions, and Division I includes over 350 schools. (NCAA Participation Rates, Ex. Z.) Within Division I, the highest tier of football competition is the Football Bowl Subdivision ("FBS"), which consists of 136 institutions competing as members of: the Power 4 Conferences ("P4") — the Southeastern Conference, Big Ten Conference, Big 12 Conference, and Atlantic Coast Conference — and the Group of 6 Conferences ("G6") — the American Athletic Conference, Conference USA, Mid-American Conference, Mountain West Conference, Pac-12 Conference, and Sun Belt Conference. The lower tier of Division I football competition is the Football Championship Subdivision ("FCS"), which consists of 127 institutions. Football is the only sport in which the NCAA subdivides its Division I membership in this manner. (NCAA Participation Rates, Ex. Z; Rascher Decl., Ex. W, P9.)

13. As an organization, the NCAA itself generated $1.29 billion in revenue for fiscal year 2024, with P4 conferences separately generating annual revenues that now approach or exceed the billion-dollar threshold. (Revenue Data, Ex. T.)

NCAA FBS conferences have a multi-year media contract with ESPN for the College Football Playoff valued at $7.8 billion in total revenue for P4 and G6 institutions. Under the NCAA House revenue-sharing model, recent data shows P4 institutions allocated an average of $20.5 million in revenues annually to student-athletes, 66% of which went to football; and G6 institutions allocated an average of $4.3 million annually, 62% of which went to football. (Opendorse, Ex. C, P28.)

14. NCAA membership is effectively mandatory for any institution seeking to participate in the highest and most popular level of collegiate athletics. Failure to abide by NCAA rules risks punitive measures including reduced scholarships, postseason bans, vacated wins, and the "death penalty." Any individual who wishes to compete at the highest level of college athletics must therefore attend an NCAA Division I member institution. For prospective athletes, there are zero practical alternatives that can provide the unique combination of attributes offered by Division I: (i) the ability to exchange athletic services for full tuition plus room and board, (ii) high quality academic educational services, (iii) top-of-the-line training facilities, (iv) high quality coaches that will best launch players to professional careers, (v) national publicity through national championships and nationwide broadcasting contracts, (vi) opportunities to profit from NIL agreements and House Settlement revenue-sharing payments, and (vii) competition at the highest level of collegiate athletics. (NCAA Bylaws, Ex. A.)

## **FACTUAL BACKGROUND**

### **I. NCAA as Commercial Enterprise**

15. In *NCAA v. Alston*, 594 U.S. 69 (2021), the Supreme Court confirmed that transactions between member institutions and athletes are commercial in nature and subject to antitrust scrutiny. Following *Alston*, the Name, Image, and Likeness marketplace has grown to $2.75 billion in the 2025-26 academic year,

with $1.95 billion flowing directly to athletes. (Ex. C, P20, P21.) Football accounts for $1.9 billion of that total, with $1.6 billion going directly to football players. Football captures 72.2% of all collective NIL spending and 76.6% of commercial spending across all sports. (Ex. C, P6, P36.) The market has grown from $918 million in its first year to $2.75 billion in five years. (Opendorse NIL Reports, Ex. C, P20.) Top FBS players earn an average of $294,134 annually in NIL compensation (Ex. C, P7), and P4 conference programs maintain average NIL collective budgets of approximately $13.9 million per year. (Ex. C, P11.) Transfer athletes earn 1.4x to 1.7x more per NIL activity than non-transfers and 1.7 times more in annual NIL compensation. (Ex. C, P9.) Updated data confirms this premium has accelerated: the average NIL deal price tripled following transfer portal windows — with football-specific deal prices surging 1.6 times above prior levels — collective spending surged 242% year-over-year, and the average commercial deal value grew 2.8 times year-over-year. (Opendorse NIL Reports, Ex. C, P26, P27, P23.)

16. The *House v. NCAA* settlement, approved in 2025, established direct revenue-sharing payments of up to $20.5 million per school for the 2025-26 season, growing to $32.9 million per school by 2034-35. The total settlement value exceeds $2.8 billion. Under the settlement, the scholarship cap expanded from 85 to 105 per team, creating 20 new scholarship spots, and football shifted from a "headcount" sport to an "equivalency" sport. The court in the House proceedings found that the settlement contributed to "a more competitive market for the labor of Division I athletes" — a judicial finding that Division I athletics constitutes a labor market. When schools pay athletes up to $20.5 million per year and the NIL market exceeds $2.75 billion annually, the rules determining which athletes may access these payments are commercial in nature and subject to antitrust scrutiny

under the Sherman Act. Specific institutional budgets confirm these allocations are not theoretical: Texas Tech has committed $28 million, LSU $18–25 million, and Iowa State $13 million in total NIL and revenue-sharing spending. (Opendorse NIL Reports, Ex. C, P37.) P4 programs report estimated annual NIL spending of $18.5 million at the top tier, $13.2 million at the middle tier, and $10.9 million at the bottom tier. (Opendorse NIL Reports, Ex. C, P39.) Revenue-sharing allocations are structured by position, with defensive backs receiving approximately 13.0% of football allocations. (Opendorse NIL Reports, Ex. C, P28, P38.)

17. The Challenged Bylaws do not define who may be a student-athlete—Morton meets all academic requirements, maintains amateur status, and is enrolled at a member institution. The Challenged Bylaws instead impose a durational restriction that limits how long Morton may participate in the Division I labor market based solely on his prior enrollment at a junior college, directly reducing his access to NIL compensation and revenue sharing. An athlete barred from a fourth season of competition loses not only a fourth year of playing time, but a fourth year of NIL deals and a fourth year of revenue-sharing payments. Courts have recognized this changed reality: the Third Circuit has held that "we can no longer per se exclude all NCAA-labeled eligibility rules from Sherman Act scrutiny without first asking whether the specific rule at issue is commercial," Elad v. NCAA, 160 F.4th 407 (3d Cir. 2025), and the District of Nevada has found that the prior classification of NCAA eligibility rules as "noncommercial" is "rendered moot" in the post-Alston era, Braham v. NCAA, 794 F. Supp. 3d 824 (D. Nev. 2025).

18. Junior Colleges or JUCOs are two-year collegiate institutions whose athletic programs are governed by the NJCAA, which has no affiliation with the NCAA. The NJCAA is a separate and independent collegiate athletic association

with its own governance structure, eligibility rules, and competitive framework. (Givens Decl., Ex. X.) Each year, more than 60,000 student-athletes from approximately 500 NJCAA member colleges compete in 27 different sports--none of which are governed or supported by the NCAA. Athletes competing for NJCAA institutions have no meaningful opportunity to earn NIL compensation, as more than 99% of all NIL dollars flow to athletes competing at NCAA Division I institutions. JUCO athletes also lack access to other economic and educational opportunities afforded by NCAA institutions. For example, NJCAA institutions offer no NIL marketplace whatsoever, no House revenue-sharing payments, no NCAA scholarship benefits, and no NCAA bachelors degree programs, among other limitations. An athlete competing at a JUCO has zero access to the Division I labor market and commercial earnings available at the NCAA level. (Opendorse NIL Report, Ex. C; Morton Decl., Ex. B.)

## II. <u>The Challenged Bylaws</u>

19. The JUCO Eligibility Limitation Bylaws create an athlete eligibility framework governed by several interlocking NCAA Bylaws that collectively operate to deny equal eligibility to JUCO transfer athletes like Morton. Together the Challenged Bylaws--12.02.6, 12.8, 12.8.1, 12.8.1.1, 12.8.3.1, and 14.3.3--preclude JUCO transfers outright from the ability to compete at the NCAA Division I level for the full four years of competition over five years of enrollment generally allotted by the NCAA. (NCAA Bylaws, Ex. A.)

20. The Five-Year Rule and Eligibility Clock (Bylaw 12.8 / 12.8.1 and 12.8.1.1). Under NCAA Bylaw 12.8, an athlete has five years of eligibility to play four seasons of "intercollegiate competition" in his chosen sport. The athlete's five-year window — known as the "Eligibility Clock" — starts to run from the date on which the athlete registers as a full-time student at any "collegiate institution,"

whether or not such institution is a member of the NCAA and whether or not the athlete competes at the non-NCAA institution. (NCAA Bylaws, Ex. A.)

21. The Intercollegiate Competition Rule (Bylaw 12.02.6). The NCAA defines "intercollegiate competition" as "occur[ring] when a student-athlete in either a two-year or a four-year collegiate institution does any of the following: . . . (a) Represents the institution in any contest against outside competition." While JUCOs are neither part of the NCAA, nor offer any opportunity to earn athletics compensation or to attain similar education advancements, the NCAA still subtracts one season of Division I eligibility from an athlete for each year the athlete competes at a JUCO. (NCAA Bylaws, Ex. A.)

22. The Season-of-Competition Count (Bylaw 12.8.3.1). Under this NCAA Bylaw, any competition at any "two-year or four-year collegiate institution" counts as a season of intercollegiate competition for Division I eligibility purposes. Thus if an athlete competes in even one game at a JUCO, that participation is credited against their four-season NCAA total upon transfer. (NCAA Bylaws, Ex. A.)

23. The Three-Year Transfer Limitation (Bylaw 14.3.3). In addition to the Five-Year Rule and the Intercollegiate Competition Rule, the NCAA independently limits all JUCO attendees to a maximum of three seasons of NCAA Division I competition: "A student who transfers to a Division I member institution from another collegiate institution shall not engage in more than four seasons of competition with not more than three of those seasons in Division I." This restriction prevents a JUCO transfer from accessing a fourth year of Division I play, even if they have a year of "clock" remaining. In tandem, NCAA Bylaws 14.3.3 and 12.8.1 punish JUCO transfers because they spent time at a non-NCAA school by capping their DI time at three years. The NCAA also maintains Bylaws

14.3.3 and 12.8.1 for JUCO transfers to Division II and Division III institutions, demonstrating the overbreadth of this restraint. (NCAA Bylaws, Ex. A.)

## III. <u>Morton's Eligibility Timeline</u>

24. Morton does not challenge the NCAA's four-season competition cap or the five-year clock window established by NCAA Bylaw 12.8. The standard "Five to Play Four" eligibility framework as generally applied to all NCAA athletes is itself not an unlawful restraint on trade or group boycott. Instead, Morton challenges only the JUCO Eligibility Limitation Bylaws that count non-NCAA competition at the JUCO level the same as "intercollegiate competition" at Division I and that create a JUCO-specific transfer cap on eligibility allotment. If the Challenged Bylaws were not applied, the 2026-2027 season would constitute Morton's fourth year of competition eligibility and fifth year of the clock.

25. In June 2021, Morton enrolled full-time at Garden City Community College, a member of the NJCAA, in Garden City, Kansas, where Morton played one year of football. During this single season at Garden City CC, Morton appeared in nine games, recording 20 tackles, one sack, two pass breakups, and one fumble recovery. Morton had no opportunity to earn NIL compensation nor was offered other NCAA benefits while competing at this JUCO. Under the Challenged Bylaws, Morton's enrollment at Garden City CC started the five-year eligibility clock and counted against the four-year competition clock for NCAA Division I. (Morton Decl., Ex. B; NCAA Bylaws, Ex. A; TransferPortal Profile, Ex. G.)

26. In January 2022, Morton then transferred to the University of Nebraska, an NCAA Division I institution and member of the Big Ten Conference, where he spent two seasons. During the 2022 season at Nebraska, Morton played in eight games, recording 2 tackles in limited action as a special teams player. During the

2023 season at Nebraska, Morton played in two games and was granted a redshirt year that did not count against the four year competition cap. (Morton Decl., Ex. B.)

27. In January 2024, Morton then transferred to Temple University, an NCAA Division I institution and member of the American Athletic Conference, where he played two seasons. During the 2024 season at Temple, Morton started at safety and played in all but one game. For the season, Morton recorded 48 tackles, 34 solo tackles, 1 pass deflection, and 1 interception. During the 2025 season at Temple, Morton served as team captain and again started at strong safety. For the season, Morton recorded 40 tackles, 27 solo tackles, 2.5 tackles for loss, and 2 pass deflections. (Morton Decl., Ex. B.)

28. Morton's complete JUCO and NCAA enrollment and competition history including eligibility impact under both the Challenged Bylaws and Equitable Relief is as follows:

| **Year** | **Institution** | **Conference** | **Status** | **NCAA Rule Effect** | **Relief Sought** |
|---|---|---|---|---|---|
| 2021-22 | Garden City CC (JUCO) | NJCAA / KJCCC | Played (9 games) | Season 1 (JUCO Rule) | Exempted (non-NCAA) |
| 2022-23 | Univ. of Nebraska | Big Ten (NCAA DI) | Played (8 games) | Season 2 | Season 1 |
| 2023-24 | Univ. of Nebraska | Big Ten (NCAA DI) | Redshirt (2 games) | Clock year only | Clock year only |
| 2024-25 | Temple University | AAC (NCAA DI) | Played (started) | Season 3 | Season 2 |
| 2025-26 | Temple University | AAC (NCAA DI) | Played (started; captain) | Season 4 (exhausted) | Season 3 |
| 2026-27 | Temple / Transfer | NCAA DI | Ineligible under JUCO Rule | Exhausted | Season 4 |

(NCAA Bylaws, Ex. A; TransferPortal Profile, Ex. G; Morton Decl., Ex. B.)

29. Under the Challenged Bylaws, Morton's five-year eligibility clock began in June 2021 when he enrolled at Garden City CC and expires in June 2026. Moreover, Morton's 2021-22 season playing JUCO football at Garden City CC also counts as one of four permitted competition seasons. Through Bylaw 12.02.6 — the Intercollegiate Competition Rule — in conjunction with Bylaws 12.8.1 and 12.8.3.1, the NCAA has erected an arbitrary JUCO barrier depriving Morton of NCAA eligibility for the 2026-27 season. As a JUCO transfer athlete, Morton is separately and independently constrained by Bylaw 14.3.3 — the Three-Year Transfer Limitation — to eligibility of just three NCAA Division I seasons. Either Bylaw alone is sufficient to deny Morton his fourth NCAA season solely by virtue of JUCO status. (NCAA Bylaws, Ex. A.)

30. Without the JUCO Eligibility Limitation Bylaws counting the NJCAA season at Garden City CC arbitrarily, Morton has used three NCAA Division I seasons—2022-23, 2024-25, 2025-26—and the upcoming 2026-27 season would be Morton's fourth and final year of competition, fitting squarely within the standard "5 to play 4" eligibility framework. (NCAA Bylaws, Ex. A; TransferPortal Profile, Ex. G.)

### *A. Athletic Performance*

31. Morton's Division I statistics demonstrate a productive, starting-caliber safety whose trajectory has ascended each season:

| **Season** | **School** | **Games** | **Tackles** | **Solo** | **TFL** | **Sacks** | **PD** | **INT** |
|---|---|---|---|---|---|---|---|---|
| 2022 | Nebraska | 8 | 2 | 1 | 0 | 0 | 0 | 0 |
| 2023 | Nebraska | 2 | — | — | — | — | — | — |
| 2024 | Temple | Started | 48 | 34 | 0 | 0 | 1 | 1 |
| 2025 | Temple | Capt.; Started | 40 | 27 | 2.5 | 0 | 2 | 0 |

Morton recorded 88 total tackles, 61 solo tackles, 2.5 tackles for loss, and 3 pass deflections over his two starting seasons at Temple (2024 and 2025). His development arc — from 2 tackles in 2022 to 48 in 2024 to 40 in 2025, combined with his ascension to team captain — makes his fourth NCAA season critical for his professional trajectory. (Morton Decl., Ex. B; TransferPortal Profile, Ex. G.) Advanced metrics confirm Morton's impact: during the 2025 season, Morton earned a Pro Football Focus ("PFF") overall defensive grade of 74.1, a coverage grade of approximately 75.2, and a run defense grade of 73.3. When targeted in coverage, Morton allowed only 51 yards on 13 targets (5.1 yards per reception allowed) with an opposing passer rating of approximately 39.6. He recorded 13 stops. (IMG Strategic Assessment Report, Ex. J.) The IMG Strategic Assessment Report characterizes Morton as a "proven secondary anchor" providing "immediate special teams + versatility value." (IMG Strategic Assessment Report, Ex. J.)

***B. Academic Progress***

32. Morton will graduate from Temple University in May 2026 with a Bachelor of Arts degree in Adult Learning, Training and Organizational Development. He has one class remaining to complete his undergraduate degree. While at the University of Nebraska, Morton was named to the Scholar-Athlete Honor Roll in Spring 2023. Morton's academic progress exceeds the requirements of NCAA Bylaw 14.4.1 (Progress Toward Degree). He is not merely progressing toward a degree — he has all but completed one. (Morton Decl., Ex. B; NCAA Bylaws, Ex. A.)

33. Upon graduation, Morton intends to pursue a masters level graduate degree next season, which would make him a "Graduate Returner" at Temple or a "Graduate Transfer" at any other Division I institution. NCAA rules permit graduate students to transfer anytime and compete immediately without restriction.

Under the House Settlement's 2026-27 rules, graduate students are exempt from the Progress Toward Degree requirements that apply to undergraduates, reducing the regulatory burden associated with revenue-sharing contracts. This economic incentive makes graduate athletes more attractive candidates for institutional compensation as transfers or returners. Morton, as a May 2026 graduate with two years of starting production, fits squarely in this priority category — whether at Temple or at any other Division I institution to which he might transfer. (NCAA Bylaws, Ex. A; House Settlement, Ex. D; Morton Decl., Ex. B.)

## IV. <u>NIL and Commercial Value</u>

34. While at University of Nebraska, Morton entered into an NIL Agreement in July 2023 with The 1890 Initiative, LLC, before his second season. The 1890 Initiative is Nebraska's NIL collective, which made an NIL deal with Morton providing for three monthly payments of $13,750, for a total of $41,250 in NIL compensation. (1890 Agreement, Ex. E.)

35. While at Temple University, Morton entered an NIL deal for the 2025-26 season providing $18,000 in player compensation. This second NIL contract establishes Morton as a current NIL earner with institutional investment in his marketability, demonstrating an economic valuation and track record of NCAA earnings. Morton's combined NIL earning history of $59,250 across two Division I programs confirms his status as a commercially active NIL participant with expected earnings for the 2026-27 season. (Morton Decl., Ex. B.)

36. Morton's current estimated NIL value is $124,000 as a graduate transfer prospect for P4 Conference NCAA institutions. His Transfer Valuation Score is 30 — a quantified market metric confirming his established transfer value. (TransferPortal Profile, Ex. G.) Based on current NIL Fair Market Value benchmarks published through the College Sports Commission's NIL Go

Clearinghouse, the fair market value of a veteran defensive back starter at a position of need is between $22,000 and $35,000 for G6 Conference NCAA institutions. Morton has a projected NIL FMV of approximately $26,000 at the G6 Conference level, which represents the conservative center of this benchmark for a player with his profile and production. (IMG Strategic Assessment Report, Ex. J; CSC NIL Go Deal Flow Report, Ex. K.) Indeed, defensive backs on Temple's roster for the 2026-27 season have signed NIL deals in this value range, corroborating the benchmark. Morton's $18,000 earned NIL deal in 2025-26 represents the floor of his NIL established value with last season's production increasing his value for the 2026-27 season. (Morton Decl., Ex. B.) Morton's NIL earning potential is consistent with broader market trends. Among FBS football players at the highest-resourced programs, 25.2% earned between $100,000 and $499,000, and 4.4% earned between $500,000 and $999,000. (Opendorse NIL Reports, Ex. C, P38.) Athletes deliver a 5.6% social media engagement rate — three times the 1.9% rate of traditional influencers — confirming their independent commercial value to brand partners. (Opendorse NIL Reports, Ex. C, P24.)

37. On February 24, 2026, Morton received an unsolicited proposal from BenX Worldwide ("BenX") for an Exclusive NIL Marketing & Athlete Development Agreement for the 2026-27 season. BenX offered NIL representation, highlight film restructuring, school placement services, and introductions to NFL agencies, among other marketing services. BenX specifically referenced that its potential representation of Morton would turn on whether injunctive eligibility relief was granted, confirming that the JUCO Rule dispute is a live controversy affecting Morton's commercial opportunities in real time. (BenX Agreement & Correspondence, Ex. F.)

38. Separately, on December 16, 2025, Innovative Marketing Group, Inc. ("IMG"), a professional sports marketing and brand management consulting firm with over 25 years of industry experience, contacted Morton to propose a strategic marketing relationship akin to BenX. (IMG Correspondence, Ex. I.)

39. On January 10, 2026, IMG delivered a Strategic Assessment Report on Morton prepared by Tevin Williams, a marketing analyst specializing in NFL and NBA player services, developed through consultations with performance trainers, sports analysts, NFL scouts, and football coaches. The IMG Strategic Assessment Report characterizes Morton as an "NFL-caliber safety" with a "prototype DB frame" (6'2", 195 lbs) and evaluates his professional ceiling for the 2027 NFL Draft as a "Day 2 discussion if ball production spikes" with consistent tape over the 2026-27 NCAA season, and his floor as a "Priority UDFA with special teams + DB versatility" for NFL teams. The IMG report identifies the 2026-27 NCAA season as the critical variable: "one additional year" would give Morton "a complete proof season" to establish his professional value. (IMG Strategic Assessment Report, Ex. J.)

40. In addition, Morton has been approached by other agencies beyond IMG and BenX further confirming broad market interest and commercial value. Most recently, on March 4, 2026, Juliette Merchant of MM Media reached out expressing interest in representing Morton for NIL opportunities for the 2026-27 season, citing his development and marketability. (Morton Decl., Ex. B; MM Media Letter, Ex. F.) These marketing solicitations demonstrate that Morton's commercial demand is established, ongoing, and active in both the NCAA and NFL football labor marketplace. (BenX Agreement & Correspondence, Ex. F; IMG Correspondence, Ex. I; IMG Strategic Assessment Report, Ex. J.)

### *A. Revenue Sharing & Graduate Transfer Status*

41. Following the House Settlement, every NCAA Division I institution in an FBS Conference has opted into the new revenue-sharing model except the three military service academies. Under this model, the NCAA began permitting direct athlete revenue-share payments in July 2025 in addition to any athlete NIL payments. (House Settlement, Ex. D; House Settlement Articles, Ex. U.) For the 2026-27 season, the revenue-sharing cap is projected at approximately $21.5 million up from $20.5 million last season in the first annual cap increase under House. While all potential FBS transfer options are permitted this increased cap, only P4 programs allocate the max level of revenue sharing allowed. G6 programs like Temple allocate much less with an average of $4.3 million in revenue-sharing payments to athletes. (Opendorse NIL Reports, Ex. C, P28.) As a proven defensive back with professional potential, Morton would be certain to have enhanced earning opportunities from both revenue sharing and marketing deals in what would be his fourth season of FBS competition. (IMG Report, Ex. J.)

42. As a May 2026 graduate, Morton would be immediately eligible to transfer to any Division I institution with full eligibility for NIL compensation, revenue-sharing payments, and a graduate program athletic scholarship. (Morton Decl., Ex. B.) Under the House Settlement, the scholarship cap expanded from 85 to 105 per team, creating 20 new scholarship spots, and football shifted from a "headcount" sport to an "equivalency" sport. (House Settlement, Ex. D.) Morton's continued eligibility would therefore require no displacement of any current roster athlete and no additional cost to any institution that rosters him. Morton is precisely the type of athlete the House Settlement's expanded market is designed to attract: a proven two-year FBS starter, team captain, and May 2026 graduate whose graduate transfer eligibility makes him a high-value, roster-neutral addition

for any FBS program. But the Challenged Bylaws foreclose JUCO athletes like Morton from the very market House was designed to open.

43. These market expansions remain systematically unavailable to JUCO transfers. Worse, the Challenged Bylaws actively suppress the labor market that House created. JUCO transfers who would otherwise participate in direct revenue-sharing as fourth-year graduate transfers are barred from doing so entirely. FBS programs seeking to maximize the return on incremental NIL and revenue-sharing investment accordingly face a narrowed talent pool: the bylaws remove experienced JUCO transfers with three years of FBS competition from the market entirely. (IMG Strategic Assessment Report, Ex. J.) Empirical data confirms that every $2 million in additional NIL spending averaged one additional win per season, and programs spending $8–10 million achieved eight or more wins. (Opendorse NIL Reports, Ex. C, P37.) The NCAA's JUCO restraints suppress potential bilateral transactions between consenting parties with de minimis institutional cost — denying every FBS program access to experienced graduate transfers at the spending levels where empirical data confirms competitive incentives to win. In turn, the same rules deny every eligible JUCO graduate transfer a fourth FBS season, stripping them of revenue-sharing compensation, NIL income, and scholarship benefits in the process..

***B. Transfer Market & NFL Pipeline***

44. Morton is not currently in the NCAA Transfer Portal. The eligibility indeterminacy created by the Challenged Bylaws prevents him from entering the portal or representing himself as available to programs. The University of Georgia and multiple other Division I programs have expressed interest in Morton for the 2026-27 season, contingent on his being granted eligibility. Temple University's coaching staff has also communicated interest in Morton's return for 2026-27,

valuing his production and leadership over two seasons. Morton has also been offered NIL and transfer marketing representation. (Morton Decl., Ex. B; TransferPortal Profile, Ex. G.) Granting Morton a fourth season of competition would result in nothing more than an arm's-length transaction between two consenting parties — Morton and the FBS institution that rosters him — producing no competitive disruption and imposing zero cost on any third party. Yet the bylaws' ineligibility designation prevents Morton from being actively marketed to or recruited by institutions and blocks pending NIL agreements, leaving these opportunities in limbo pending a determination of eligibility.

45. Morton is more than three years removed from high school graduation and is automatically eligible for the 2026 NFL Draft under NFL rules. He has been invited to and is scheduled to participate in an individual workout with the New York Giants for NFL Draft scouting purposes — an invitation that confirms professional teams are actively evaluating Morton and that his draft prospects are not speculative. However, a fourth NCAA season (2026-27) would be Morton's critical "film year" for the 2027 NFL Draft, providing additional Division I game film covering a third year of production. The Challenged Bylaws thus threaten two distinct and non-repeatable professional opportunities: the 2026 Draft (imminent) and the 2027 Draft (contingent on a fourth season of tape). (Morton Decl., Ex. B.)

46. Without an expedited eligibility determination, Morton cannot secure an NFL-certified agent or participate in the final pre-draft scouting window while also maintaining potential NCAA eligibility when faced with legal uncertainty regarding his ability to return for a fourth season of NCAA Division I competition. The Challenged Bylaws force an impossible choice between two non-repeatable career paths — the 2026 NFL Draft and a graduate season of Division I

competition — when the rules creating the dilemma are themselves unlawful. (Morton Decl., Ex. B.)

47. The 2026 NFL Draft begins April 23, 2026. NFL teams finalize draft boards and UDFA priorities weeks before the draft. Upon the draft's conclusion, a 48-hour undrafted free agent signing window opens in which NFL teams fill remaining roster spots. Morton must notify Temple within three days of the draft's conclusion of his intention to return to NCAA competition for the following season. The Challenged Bylaws leave Morton in a disadvantaged and uncertain status that permanently damages his current draft stock and his eligibility for post-draft UDFA roster spots, which are filled within 48 hours of the draft's conclusion. (IMG Strategic Assessment Report, Ex. J; Morton Decl., Ex. B.)

## V. <u>NCAA Internal Inconsistencies</u>

### *A. Disparate Eligibility Clocks*

48. The NCAA does not similarly penalize athletes who competed in other non-NCAA settings:

| Competition Type | Counted as NCAA Season? | NCAA Affiliated? |
|---|---|---|
| JUCO (NJCAA) | YES | NO |
| Prep School Competition | NO | NO |
| Certain Professional or Semi-Professional League Play | NO | NO |
| European Professional Academies | NO | NO |
| Olympic/National Team Participation | NO | NO |
| Club/Amateur Play | NO | NO |

The disparate treatment is arbitrary. Junior colleges do not grant four-year bachelor's degrees—the defining credential of a "college" or "university" as recognized by the U.S. Department of Education. Junior college athletes have no access to NIL compensation, no House revenue-sharing payments, no meaningful

media exposure, and no professional development pipeline comparable to Division I. Yet the NCAA counts time spent at these non-NCAA institutions against Division I eligibility while exempting athletes with comparable or greater post-high-school experience at prep schools, in military service, or on religious missions. The JUCO Eligibility Limitation Bylaws are therefore arbitrary restraints by which the NCAA disparately impacts economic opportunities and labor markets available to JUCO athletes. (NCAA Bylaws, Ex. A.)

49. The NCAA has permitted Monte Harrison, a 30-year-old sophomore at the University of Arkansas, to compete in Division I athletics after a multi-year professional baseball career. None of Harrison's professional seasons counted against his NCAA eligibility. Morton, who played one season of football at Garden City CC — a non-NCAA institution — cannot access his fourth NCAA season solely because he first enrolled at a JUCO. (Arkansas Roster, Ex. O; Morton Decl., Ex. B.) The NCAA also permits unlimited transfers through the Transfer Portal and allows other non-JUCO transfers to compete at Division I institutions for the full four-year allotment, yet categorically penalizes JUCO transfers solely because of where they first enrolled. The differential treatment imposed by the Challenged Bylaws amounts to a career-long punishment and financial roadblock for those who attend JUCO schools — a choice often driven by financial necessity, family circumstances, or academic preparation needs. No other category of transfer athlete faces this penalty.

### *B. Arbitrary Blanket Waivers*

50. In *Pavia v. NCAA*, 760 F. Supp. 3d 527 (M.D. Tenn. 2024), the court granted injunctive relief to a JUCO transfer athlete on substantially similar facts. Following Pavia, the NCAA issued a one-time Blanket Waiver (Case No. 1214) in December 2024, granting an additional season of eligibility to JUCO-affected

athletes — but only for the 2024-25 season. The NCAA subsequently extended the waiver to cover Fall 2025 and Spring 2026, but refused to extend it to the 2026-27 season or beyond. (Blanket Waiver, Ex. H.)

51. The Blanket Waiver constitutes an implicit admission that counting JUCO seasons against Division I eligibility lacks a rational basis. If the JUCO Rule served an essential procompetitive or educational purpose, the NCAA could not have waived it for an entire class of athletes without competitive disruption. The willingness to waive the rule for 2024-25 and 2025-26, followed by refusal to extend to 2026-27, reveals the JUCO Eligibility Limitation Bylaws application as arbitrary.

52. Morton enrolled at JUCO in June 2021, missing the COVID eligibility window by one academic year. An athlete who enrolled in 2020-21 received a blanket extra year with no individualized showing; Morton receives no such accommodation. (NCAA COVID Waiver, Ex. M.) The disparity's market-wide impact was immediate: JUCO football transfers to P4 conferences dropped from an average of 114 per year (2018-2020) to 54 per year (2021-23) — a 53% decline, quantifying the deterrent effect and market impact of the Challenged Bylaws in a post-*Alston* world. (CBS Sports / The Athletic Data, Ex. P; NCAA Transfer Composition Research, Ex. V.)

***C. Waiver Process & Futility***

53. Under NCAA Bylaw 5.4.1.3, only member institutions — not individual athletes — may file Legislative Relief Waivers with the NCAA. Morton cannot file a waiver on his own behalf. "JUCO participation" is not a recognized waivable category under Bylaw 14.2.1; these cover pregnancy, medical conditions, international competition, and military service. (NCAA Bylaws, Ex. A.)

54. Temple University has declined to file a waiver for Morton. (Morton Decl., Ex. B.) Temple's refusal reflects institutional reluctance to confront the NCAA's enforcement apparatus, including the Rule of Restitution (Bylaw 12.11.4.2), which threatens retroactive punishment against any institution that competes with an athlete whose eligibility was obtained by court order. (Vaughn Decl., Ex. Y.) The futility of the NCAA waiver process is further demonstrated by the experience of other JUCO plaintiffs: in *Blythe v. NCAA*, the plaintiff's institution submitted a waiver in October 2025 and the NCAA informally denied it in January 2026 but refused to issue a formal denial letter; in *Elad v. NCAA*, Rutgers University received a denial on February 28, 2025; in *Hasz v. NCAA*, UNLV received a staff-level denial on May 8, 2025, upheld on internal appeal on July 14, 2025. In no case has the NCAA granted an individual JUCO Rule waiver.

55. Even if a waiver were filed, the NCAA's processing timeline would push any decision well past the 2026 NFL Draft and into the start of the 2026-27 season. The NCAA's own Guide for Two-Year College Transfers publishes a 21-day processing target, yet actual waiver processing in JUCO eligibility cases has routinely exceeded six months. (NCAA Guide for Two-Year Transfers, Ex. L.) The NCAA's categorical litigation posture — defending the JUCO Rule in dozens of cases nationwide, including through appellate litigation in the Third, Fourth, Sixth, and Seventh Circuits — confirms administrative futility as a matter of law.

## VI. <u>Relevant Market</u>

### *A. Relevant Market Definition*

56. The relevant product market is the market for NCAA Division I FBS football player labor services in the United States (the "FBS Labor Market"). The relevant general market is the nationwide market for NCAA Division I college football player services, within which the FBS constitutes a cognizable submarket

where anticompetitive harm is concentrated. The Challenged Bylaws apply identically across all of Division I — restricting JUCO transfers at FCS institutions in the same manner as at FBS institutions — but the commercial stakes are highest in the FBS submarket, where revenue sharing reaches $20.5 million per institution and athletes participate in a $1.9 billion NIL economy. This market encompasses all transactions in which FBS member institutions acquire the athletic services of football players in exchange for scholarships, NIL compensation, and direct revenue-sharing payments under the House Settlement. These athletes' labor produces revenue for member institutions through athletic competition, media rights, ticket sales, and associated commercial activities.

57. The geographic scope of the relevant market is nationwide — the NCAA operates across all 50 states, Division I institutions recruit nationally and internationally, and athletes routinely relocate across state lines to compete. Plaintiff's own recruitment history — from Kansas to Nebraska to Pennsylvania, with documented interest from programs in Georgia and across multiple states — illustrates the interstate character of this market. (NCAA Bylaws, Ex. A; House Settlement, Ex. D; Rascher Decl., Ex. W.) The overall NIL and revenue-sharing market exceeds $2.75 billion annually, with football comprising the dominant share of this market across all transaction channels. (Opendorse NIL Reports, Ex. C, P21.) All 136 FBS member institutions across ten conferences compete for football player labor in this market, and Opendorse maintains at least one active student-athlete user at 98% of NCAA, NAIA, and NJCAA member institutions — documenting the breadth and interstate character of the labor market the Challenged Bylaws restrain. (Opendorse NIL Reports, Ex. C, P16.)

58. The FBS Labor Market is substantial and commercially significant. The football NIL economy totals $1.9 billion annually — comprising $290 million in

commercial deals, $213 million in collective spending, and $1.4 billion in collegiate revenue-sharing — with $1.6 billion flowing directly to football players. (Opendorse NIL Reports, Ex. C, P36.) Top 25 P4 football earners command $294,134 annually, growing +33% year-over-year. (Opendorse NIL Reports, Ex. C, P7.) The football NIL market grew from $1.1 billion to $1.9 billion in a single year — a 73% increase — and P4 football NIL grew 33% year-over-year. (Opendorse NIL Reports, Ex. C, P5, P36, P7.) Following approval of the House Settlement, FBS institutions may distribute up to $20.5 million per school annually in direct revenue-sharing payments to student-athletes.

59. As the Congressional Research Service has recognized, the House Settlement "fundamentally restructure[d] the economic relationship between schools and athletes" by establishing a direct revenue-sharing framework that transformed college athletics into a recognized labor market with defined compensation channels. (CRS Report LSB11349, Ex. S.) Eligibility to compete determines eligibility to receive these payments. Plaintiff provides current empirical data demonstrating the market's size, structure, and commercial nature in the post-Alston, post-House era. Plaintiff does not challenge the general eligibility framework. Plaintiff challenges JUCO-specific bylaws that impose additional, disparate restrictions on a defined subclass of athletes, and does so in a market in which eligibility rules now directly determine access to quantifiable compensation channels. (Opendorse NIL Report, Ex. C; House Settlement, Ex. D.)

***B. Absence of Substitutes***

60. There are no reasonable substitutes for the FBS Labor Market. The NFL requires athletes to be at least three years removed from high school graduation before draft eligibility, making Division I FBS football the exclusive developmental pathway for college-age players. Professional leagues (NFL, CFL,

UFL) operate in a downstream market with different eligibility requirements, timing, and salary structures. The NAIA offers lower compensation, minimal NIL opportunities, no House revenue-sharing, and no College Football Playoff. The NJCAA offers zero NIL marketplace, no House payments, no NFL pipeline exposure, and no NCAA affiliation. Divisions II and III have different scholarship limits, no House revenue-sharing, a minimal NIL marketplace, and no College Football Playoff. Among FBS football players at the highest-resourced programs — emblematic of the compensation structure across the FBS Labor Market — over 31% earned $100,000 or more in NIL compensation, with 1.5% earning more than $1 million, a five-fold increase from preseason projections. (Opendorse NIL Reports, Ex. C, P38.)

61. The JUCO Rule excludes experienced former junior college players from competition for these earnings tiers, suppressing not only individual compensation but the competitive pressure that drives market-wide wages upward across the FBS Labor Market. Yet only 3.8% of football players will ever reach the NFL, where the median salary is $860,000 — confirming that the Division I market is the primary compensation market for the overwhelming majority of college football players. (Opendorse NIL Reports, Ex. C, P29.) The cross-elasticity of demand between Division I FBS football and the markets available to excluded JUCO transfers is effectively zero. (Rascher Decl., Ex. W; Opendorse NIL Report, Ex. C; OutKick JUCO Transfer Portal NIL Data, Ex. Q.) Because the Challenged Bylaws foreclose JUCO transfers from all of Division I — not just FBS — and no Division I subdivision constitutes a reasonable substitute for FBS competition, the relevant general market has no viable substitutes at any level.

### *C. Monopsony Power*

62. The NCAA and its Division I member institutions exercise monopsony power over the FBS Labor Market as the sole meaningful purchasers of Division I FBS football labor. No viable competing buyer exists. As the Supreme Court recognized in *Alston*, the NCAA possesses "enormous power" in the market for student-athlete services. *NCAA v. Alston*, 594 U.S. 69, 90 (2021).

Justice Kavanaugh confirmed in concurrence that the "NCAA acknowledges that it controls the market for college athletics" and "accepts that its members collectively enjoy monopsony power" in the market for student-athlete services. *Id.* at 109 (Kavanaugh, J., concurring). Post-*Alston*, that the NCAA has monopsony power over the labor market for competitive student-athletes' services has only become more uncontestable, given the fact that NCAA Division I sports accounts for over 99% of NIL opportunities, and, as of July 1, 2025, NCAA members now compete to recruit athletes with direct compensation. P4 conference programs maintain average NIL collective budgets of approximately $13.9 million per year, reflecting the scale of institutional investment in acquiring and retaining football labor. (Opendorse NIL Report, Ex. C.)

63. Within this exclusive market, Division I institutions are simultaneously colluders and competitors acting in concert through the NCAA, which has the "sole ability to dictate the rules and regulations for participation." *Martinson v. NCAA*, No. 2:25-cv-01376 (D. Nev. Sep. 18, 2025). As Dr. Joel Maxcy explained in expert testimony, rules like the Challenged Bylaws "distort[] the labor market by reducing competition, depressing the prices at which Division I schools can acquire athletes, and the pay athletes can earn in NIL agreements." (Maxcy Expert Report, Ex. R; Rascher Decl., Ex. W; Opendorse NIL Report, Ex. C.) The concentration of football NIL spending further confirms this monopsony: football captures 72.2% of

all collective NIL spending and 76.6% of all commercial spending. (Opendorse NIL Reports, Ex. C, P6.) Revenue-sharing allocations demonstrate coordinated buyer-side structure: P4 institutions direct 65.6% of their revenue-sharing pools to football, while G6 institutions direct 61.9% — translating to approximately $13.4 million in football-specific allocations at P4 programs and $2.7 million at G6 programs. (Opendorse NIL Reports, Ex. C, P28.) Within football, allocations are structured by position, with defensive backs receiving approximately 13.0% of football allocations — further evidence of coordinated buyer-side market control. (Opendorse NIL Reports, Ex. C, P28, P37.)

64. According to NCAA Transfer Portal data, JUCO transfers comprise approximately 6-10% of all Division I transfers annually — a substantial segment of this labor market that the Challenged Bylaws categorically exclude from full participation. (TransferPortal Profile, Ex. G; NCAA Transfer Composition Research, Ex. V; NCAA Participation Rates, Ex. Z.) Because transfer athletes command a premium in the NIL marketplace (¶15), the Challenged Bylaws remove an entire class of premium-earning athletes from the market for a year or more. Updated data quantifies this premium with greater precision: the average football NIL deal price surged 1.6 times above prior levels in the weeks following transfer portal windows. (Opendorse NIL Reports, Ex. C, P26.) By foreclosing JUCO transfers from a full fourth season, the Challenged Bylaws eliminate access to this portal-driven premium market for the excluded class. The Challenged Bylaws constitute horizontal agreements among FBS member institutions — competitors for student-athlete labor — that restrict entry into the FBS Labor Market by reducing the number of seasons former junior college athletes may compete, thereby excluding qualified athletes from accessing NIL compensation,

revenue-sharing payments, and professional development opportunities available only through FBS competition. (Opendorse Report, Ex. C; NCAA Bylaws, Ex. A.)

## VII. Anticompetitive Effects

### *A. Horizontal Agreement Among Competitors*

65. Division I member institutions compete against one another for the services of student-athletes. The Challenged Bylaws — Bylaws 12.02.6, 12.8, 12.8.1, 12.8.1.1, 12.8.3.1, and 14.3.3 — were adopted through the NCAA's collective governance process, in which member institutions vote to establish and maintain the rules that govern athlete eligibility and competition. These Bylaws constitute horizontal agreements among competitors — "a contract, combination, or conspiracy" within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1. (NCAA BylawA.)

66. The Supreme Court has confirmed this framework. In *NCAA v. Board of Regents*, 468 U.S. 85, 99 (1984), the Court held that "the NCAA member institutions have created a horizontal restraint — an agreement among competitors on the way in which they will compete with one another." In *Alston*, 594 U.S. at 81, the Court reaffirmed that NCAA bylaws are agreements among competitors subject to Section 1 scrutiny. The Sixth Circuit has since recognized that such horizontal agreements among competing employers "not to negotiate with defined segments of the labor force" have "not fared well under the Sherman Act" in analogous professional sports and labor market contexts. *Pavia v. NCAA*, 154 F.4th 407 (6th Cir. 2025).

### *B. Market Foreclosure and Structural Harm*

67. The Challenged Bylaws bar Morton from his fourth NCAA season solely because he played at a JUCO in 2021-22, completely foreclosing him from the Division I FBS football labor market after the 2025-26 season. This is not partial

limitation — it is total exclusion from the only market that offers meaningful NIL compensation, House revenue-sharing, and professional pipeline access. The Challenged Bylaws extinguish all of Morton's documented commercial interests for the 2026-27 season that would otherwise be available as a fourth year of NCAA Division I competition: his NIL history of $59,250 (¶¶34-35), his current valuation of $124,000 (¶36), his projected 2026-27 NIL fair market value (¶36), the BenX and IMG representation opportunities (¶37), the expressed interest of DI institutions (¶44), his access to institutional revenue-sharing (¶¶41-43), his access to NIL marketplace deals (¶¶34-35), and his improved 2027 NFL Draft pipeline (¶¶45-48). None of these interests are speculative; all are documented and contingent on eligibility. Morton's harm is imminent and cannot be remedied by monetary damages. An athletic season at peak competitive age is a unique, time-sensitive opportunity that is permanently extinguished once it passes. Both the 2026 and 2027 NFL Draft opportunities are likewise unique and non-repeatable.

68. The Challenged Bylaws do not merely harm Morton — they diminish the competitive pressure that generates market-wide compensation increases for all FBS football players. The availability and mobility of FBS football players are market-wide compensation drivers, not individual variables. Average football NIL deal prices surged 1.6 times above prior levels in the weeks following transfer portal windows, elevating compensation not only for transferring players but for incumbents whom programs must pay more to retain. (Opendorse NIL Reports, Ex. C, P26.) Institutional spending confirms the aggregate nature of this dynamic: year-over-year collective spending growth was +242% overall from 2024 to 2025, with a +824% surge in June alone as more than half of P4 institutions front-loaded 25–50% of a projected annual cap in the fiscal year's final weeks. (Opendorse NIL Reports, Ex. C, P27.) Football receives 72.2% of all collective spending

allocations. (Opendorse NIL Reports, Ex. C, P6.) The JUCO Rule's annual exclusion of a class of experienced former junior college football players from this labor pool diminishes the competitive pressure that generates these market-wide spending increases for all FBS football players.

### *C. Output Reduction and Wage Suppression*

69. These market-wide anticompetitive effects extend beyond compensation suppression to total output reduction. The JUCO Rule categorically excludes an entire class of JUCO transfers from full participation in the FBS Labor Market. Each excluded JUCO athlete loses one or more seasons of Division I competition and its associated NIL earnings, House revenue-sharing, and scholarship benefits. Total market output, measured in athlete-seasons of Division I competition, decreases. No other athlete gains the lost season. The data alleged herein demonstrates that athlete availability is itself a market-moving variable: portal-window pricing surges and aggregate spending increases (¶68) respond to the supply of available athletes, not to any individual athlete's value. Because collective spending responds to aggregate supply — not individual talent — the JUCO Rule's categorical exclusion of a class of experienced athletes from the labor pool diminishes competitive pressure market-wide, suppressing compensation not only for the excluded class but for all FBS football players who compete in a market with fewer experienced participants.

70. Removing experienced football players from the FBS labor market suppresses the overall compensation distribution. Top 25 P4 football earners command $294,134 annually, growing +33% year-over-year. (Opendorse NIL Reports, Ex. C, P7.) The income distribution among P4 football players shows that when experienced players compete for roster spots, wages rise across all brackets: the share earning more than $1 million increased fivefold from preseason levels,

the \$500K–\$999K bracket increased sevenfold, the \$100K–\$499K bracket tripled, and brackets between \$10K and \$99K doubled — while the share earning less than \$10K contracted by a factor of three. (Opendorse NIL Reports, Ex. C, P38.) Because experienced football transfers command a 1.4x–1.7x earnings premium over non-transfers (Opendorse NIL Reports, Ex. C, P9), and represented football athletes earn 2.1 times more than unrepresented athletes (Opendorse NIL Reports, Ex. C, P38), the JUCO Rule systematically excludes from the FBS football market the players most likely to occupy the upper tiers of this distribution — experienced former junior college players in their would-be fourth year — thereby suppressing compensation across all brackets for all FBS football players.

***D. Recruiting Distortion and Competitive Quality***

71. The FBS Labor Market is the primary compensation market for college football players. Only 3.8% of football players will ever reach the NFL, where the median salary is \$860,000. (Opendorse NIL Reports, Ex. C, P29.) Among all athletes who earned \$100,000 or more in NIL compensation, 69% remained current college athletes rather than turning professional — confirming that Division I competition, not professional sports, is the peak earning opportunity for the vast majority of college football players. (Opendorse NIL Reports, Ex. C, P22.) The Challenged Bylaws distort athlete allocation decisions across this market. Athletes choose to enroll directly in Division I programs over JUCO institutions — even when JUCO would better serve their development or financial situation — because JUCO enrollment triggers the eligibility clock and consumes a season of NCAA Division I competition otherwise available. Opendorse maintains at least one active student-athlete user at 98% of NCAA, NAIA, and NJCAA member institutions, documenting the breadth of the competitive landscape that the JUCO Rule distorts by penalizing athletes who begin their careers at NJCAA institutions.

(Opendorse NIL Reports, Ex. C, P16.) This exclusion diverts talent away from NJCAA member institutions, which did not agree to the restraint, have no voice in the NCAA's governance process, and are third-party victims of a rule adopted without their input or consent. (Givens Decl., Ex. X; Front Office Sports, Ex. N.) The downstream consequences are measurable: more than 55% of top-spending FBS collectives — whose budgets are driven primarily by football allocations — finished in the top 20 in overall athletics success, confirming that the talent allocation decisions the JUCO Rule distorts have direct competitive consequences for institutions and their consumers. (Opendorse NIL Reports, Ex. C, P12.)

72. Even under the House settlement's roster limits and compensation caps, the JUCO Rule harms the FBS football market through the quality and distribution of compensation. The income data shows that who fills football roster spots — not merely how many spots exist — determines wage distribution: the share of P4 football players earning $500K–$999K increased sevenfold and $100K–$499K tripled from preseason to post-revenue-sharing, even within constrained institutional budgets. (Opendorse NIL Reports, Ex. C, P38.) The FBS football market is segmented by position, with revenue-share allocations ranging from 16.9% for Quarterbacks to 1.5% for Specialists — reflecting that positions carry differential competitive importance and are not interchangeable. (Opendorse NIL Reports, Ex. C, P38.) Because experienced former JUCO football players compete at specific positions, their exclusion cannot be offset by the availability of less experienced players at other positions; it creates position-specific competitive voids that degrade the quality of play unevenly across the roster.

73. JUCO transfers who have received injunctions in *Pavia*, *Martinson*, *Blythe*, and other cases have contributed materially to their teams' competitive performance — confirming that experienced JUCO players fill roster needs that

cannot be replicated by less experienced alternatives. Cost-per-win data — showing that every $2 million in incremental football NIL spending averaged one additional win per season (Opendorse NIL Reports, Ex. C, P37) — confirms that replacing experienced JUCO transfers with less experienced alternatives reduces competitive output even when total spending is fixed. A survey of athletic directors and NIL directors further confirms that the House settlement's spending caps are not functioning as effective market constraints: 45% of collectives have adopted an agency model, 31% have dissolved entirely, high confidence in cap enforcement declined from 7.0 to 6.5, and average confidence declined from 4.3 to 3.8 on a ten-point scale. (Opendorse NIL Reports, Ex. C, P39.) Because these caps are not binding in practice, the JUCO Rule's exclusion of experienced football players suppresses market-wide competition in what is effectively an unregulated spending environment — compounding the wage suppression and quality degradation described above by removing experienced competitors from a market where well-resourced programs already spend beyond nominal limits.

***E. Concerted Refusal to Deal***

74. The market-wide effects described above are the product of a concerted refusal to deal and group boycott by the NCAA against JUCO athletes. Division I institutions, acting through the NCAA, jointly agreed to exclude JUCO transfer athletes from full and equal access to the Division I labor market based solely on prior JUCO enrollment. The NCAA has advanced the position that the JUCO Eligibility Limitation Bylaws serve the purpose of preventing experienced athletes from displacing younger players — a labor-market allocation rationale that is precisely the type of restraint the Sherman Act prohibits.

75. The restraint is naked — not ancillary to producing college athletics. The Blanket Waiver (¶¶50-51) proved that the JUCO Eligibility Limitation Bylaws are

not essential to producing the competitive product. The NCAA lacks any recognized antitrust exemption. Professional sports leagues that impose comparable labor restraints do so under collective bargaining agreements, statutory exemptions, or judicial exemptions. The NCAA has none. NCAA athletes have no collectively bargained agreement to these rules. Courts have struck down analogous horizontal labor restraints, including the NFL draft (*Smith v. Pro Football, Inc.*, 593 F.2d 1173 (D.C. Cir. 1979)), the Rozelle Rule (*Mackey v. NFL*, 543 F.2d 606 (8th Cir. 1976)), the NBA's four-year college rule (*Denver Rockets v. All-Pro Management*, 325 F. Supp. 1049 (C.D. Cal. 1971)), and employer no-poach agreements. The Challenged Bylaws function identically: horizontal agreements among competing employers not to employ JUCO transfers beyond an artificially restricted period, enforced by a monopsonist with no alternative market available to excluded athletes.

## VIII. <u>Procompetitive Justifications Fail</u>

### *A. Educational Attainment*

76. Educational Goal Attainment Fails. The NCAA's primary procompetitive justification for the Challenged Bylaws is that they promote timely graduation. This justification collapses as applied to Morton. He is graduating from Temple University in May 2026 — before the start of the season from which he is barred. His academic progress exceeds NCAA Bylaw 14.4.1 (Progress Toward Degree) (¶32). The rule is not helping graduation attainment — Morton will have already graduated. The NCAA's own rules permit graduate students to transfer and compete immediately — an implicit acknowledgment that competition and academic progress are not in tension for students who have earned their degrees. The Transfer Portal permits unlimited transfers that may disrupt degree progression, yet imposes no eligibility penalty.

### *B. Competitive Balance*

77. Competitive Balance Fails. The NCAA argues that granting additional eligibility disrupts roster planning and competitive balance. Morton's continued eligibility has no different impact on competitive balance than any other graduate transfer. The 85-to-105 scholarship expansion created 20 new roster spots (¶16), and granting Morton a fourth season results in an arm's-length transaction between two consenting parties — Morton and the FBS institution that rosters him — imposing zero cost on any third party. No institution would be burdened by Morton's continued eligibility. The competitive balance defense is further undermined by the NCAA's willingness to accommodate athletes like Monte Harrison — a 30-year-old former professional athlete competing at the University of Arkansas — while categorically excluding JUCO transfers from the generally available fourth year of competitive eligibility at the Division I level. If a decade of professional baseball does not disqualify an athlete from the full allotment of Division I eligibility, one year of JUCO football cannot lawfully do so.

### *C. Maintaining Amateurism*

78. Amateurism Fails. The Supreme Court in *Alston* held that "the NCAA is not above the law" and that traditions of amateurism cannot justify restraints without rigorous antitrust analysis. 594 U.S. at 90-91. Post-House, institutions will pay athletes directly — up to $20.5 million per school (¶16). When NCAA institutions are paying athletes from institutional revenue, and NIL deals are earned by most if not all Division I football players, any notion "amateurism" is functionally dead as a legal defense. The football NIL economy grew from $1.1 billion to $1.9 billion in a single year — a 73% increase — without any demonstrated harm to consumer demand for college football. (Opendorse NIL Reports, Ex. C, P5, P36.) P4 football NIL grew 33% year-over-year (Opendorse NIL Reports, Ex. C, P7), and P4 programs' estimated annual football NIL spending

increased from $15 million at the top tier to $18.5 million over a single season — confirming that institutional investment in football is accelerating, not stabilizing. (Opendorse NIL Reports, Ex. C, P39.) The JUCO Eligibility Limitation Bylaws have no relationship to the amateur status of athletes; a JUCO transfer is an amateur athlete transferring from one amateur institution to another. Nothing in the Challenged Bylaws relates to the NCAA's definition of amateur status.

***D. The Rules Are Anachronistic***

79. The Rules Are Anachronistic. The Challenged Bylaws were designed for a pre-NIL, pre-House, pre-unlimited-transfer era. Today's Division I landscape includes direct revenue-sharing, a $1.9 billion football NIL marketplace that grew 73% in a single year (¶58), unlimited transfer portal access, and an expanded College Football Playoff. The NCAA has acknowledged ongoing discussions about further framework changes. The procompetitive justifications offered by the NCAA for these JUCO Eligibility Limitation Bylaws have been overtaken by market changes the NCAA itself has permitted and promoted.

## IX. Less Restrictive Alternatives

80. Five Less Restrictive Alternatives Exist. (1) The NCAA could start the eligibility clock when an athlete first enrolls at an NCAA member institution, rather than at any "collegiate institution" that encompasses JUCOs. (2) The NCAA could redefine "intercollegiate competition" under Bylaw 12.02.6 to mean competition sanctioned by the NCAA, excluding NJCAA and other non-NCAA competition from the season count. (3) The NCAA could delete Bylaw 14.3.3, which independently limits two-year JUCO transfers to three DI seasons — a restriction that applies to no other category of transfer athlete. (4) The NCAA could grant all athletes four full seasons of Division I competition regardless of prior non-NCAA enrollment, treating JUCO competition identically to prep school,

minor league, and overseas competition. (5) The NCAA could evaluate JUCO athletes on a case-by-case basis, as it already does for medical hardship and other waiver categories, rather than imposing a categorical ban.

81. The Blanket Waiver (¶¶50-51) proves these alternatives are feasible — the NCAA accommodated additional eligibility without competitive disruption. Existing exemptions for military service, religious missions, and COVID-affected athletes further confirm that less restrictive approaches are workable. (Blanket Waiver, Ex. H.)

**X. <u>No House Settlement Preemption</u>**

82. Morton does not challenge the eligibility-period structure established by the House Settlement. He does not seek to extend the Five-Year Rule or increase the four-season limit. He challenges the definition of what counts as a season — a classification rule antecedent to, and independent of, the eligibility-period framework. (House Settlement, Ex. D.)

83. The House Settlement's "Released Injunctive Class Claims" address rules governing "the number of seasons/length of time student-athletes are eligible to receive benefits." Morton challenges the counting of non-NCAA, JUCO competition as "intercollegiate competition" — a market-access restriction that determines whether an athlete can enter the Division I marketplace at all. The JUCO Eligibility Limitation Bylaws determine market access (who may compete), not benefits distribution (how compensation is allocated once an athlete is in the market). (House Settlement, Ex. D.)

84. This distinction is consistent with the Congressional Research Service's analysis of the House Settlement's scope, which recognizes that the settlement governs the distribution framework for athlete compensation, not antecedent

classification rules that determine which athletes qualify to participate. (CRS Report LSB11349, Ex. S.)

**XI. <u>Rule of Restitution</u>**

85. Under NCAA Bylaw 12.11.4.2 (the "Rule of Restitution"), the NCAA asserts that if a court enjoins the NCAA from enforcing a rule and the injunction is subsequently reversed or vacated, the athlete and the institution must forfeit all victories, records, and benefits obtained during the period of the injunction. (NCAA Bylaws, Ex. A.)

86. The Rule of Restitution operates as a deterrent to legal challenges by athletes and institutions alike. Any institution that competes with an athlete whose eligibility was obtained by court order risks forfeiting its entire season if the order is later overturned. This chills the willingness of institutions to support athletes' legal claims and deters judicial review of the NCAA's rules. As Jerry Vaughn, former NCAA Director of Academic and Membership Affairs, has attested, the Rule of Restitution was adopted through Board-level coercion over the objection of membership, and functions as an enforcement mechanism designed to discourage institutions from supporting legal challenges to NCAA rules. (Vaughn Decl., Ex. Y.) Its purpose is to punish challenges to the NCAA's anticompetitive rules by attempting to deprive courts of the ability to grant effective relief.

87. Morton seeks an order enjoining the NCAA from enforcing the Rule of Restitution as it pertains to him and any institution at which he competes, consistent with the injunctions entered in *Pavia v. NCAA*, 760 F. Supp. 3d 527 (M.D. Tenn. 2024); *Martinson v. NCAA*, 804 F. Supp. 3d 1109 (D. Nev. 2025); and *Blythe v. NCAA*, No. 3:26-cv-00100 (D. Nev. Feb. 20, 2026).

**XII. <u>Plaintiff's Irreparable Harm</u>**

88. The irreparable harm to Morton is multi-dimensional, concurrent, and incapable of remedy through monetary damages. As shown in the lettered paragraphs below, Morton will suffer irreparable harm without injunctive relief in the following ways:

(a) *Lost Season of Competition.* The 2026-27 season is a unique, non-repeatable competitive opportunity that cannot be replayed. Every court to consider the question in a JUCO eligibility case has found that the loss of an athletic season constitutes irreparable harm.

(b) *Extinguished NIL Revenue.* The NIL revenue documented in ¶¶34-37 — including $59,250 in historical earnings and projected 2026-27 compensation — is contingent on eligibility. Active representation solicitations from BenX Worldwide and Innovative Marketing Group are likewise contingent on eligibility. Without eligibility, all future NIL earning potential is permanently extinguished.

(c) *Forfeited Revenue-Sharing Payments.* As a graduate transfer eligible for institutional revenue-sharing under the House Settlement framework (¶¶41-42), Morton would receive direct revenue-sharing compensation at any FBS institution that rosters him. Whether he returns to Temple or transfers, this compensation stream exists only during active roster membership. Ineligibility eliminates it entirely.

(d) *Destroyed NFL Draft Window.* Morton requires an expedited ruling to preserve his professional options. Without one, Morton is left in a disadvantaged unknowing status, permanently damaging his draft stock and his eligibility for post-draft roster spots, which are filled immediately upon the draft's conclusion. Morton has received an individual workout invitation from the New York Giants (¶45) and a professional evaluation projecting his 2027 NFL Draft ceiling as a Day 2 discussion if ball production spikes over a fourth NCAA season, with his floor at

Priority UDFA (¶39). Both the 2026 and 2027 NFL Draft opportunities are unique and non-repeatable.

(e) *Suppressed Transfer Market Access.* Morton cannot enter the Transfer Portal due to eligibility indeterminacy (¶44). Professional marketing firms confirm he would be a sought-after transfer prospect if his eligibility were resolved, but programs cannot commit resources to an athlete whose eligibility is in doubt.

(f) *The Eligibility Catch-22.* Morton cannot sign an NFL-certified agent or accept financial benefits without jeopardizing potential NCAA eligibility (¶46). The Challenged Bylaws force a choice between two career paths when the rules creating the dilemma are themselves unlawful.

(g) *Chilling Effect of the Rule of Restitution.* The Rule of Restitution (¶¶85-86) threatens retroactive punishment against any institution that competes with Morton under a court order, suppressing institutional willingness to recruit, roster, or compensate him.

89. The lack of legal certainty over JUCO Eligibility Limitation Bylaws damages Morton's recruitment prospects, NIL opportunities, and professional preparation. Expedited consideration is required to allow Morton to preserve both career paths — the 2026 NFL Draft and a graduate season of Division I competition — before professional deadlines permanently foreclose his options.

90. A fourth season would provide the same development opportunity non-JUCO graduate transfers routinely receive: additional Division I starting production, coaching development, and scouting exposure. Without it, Morton loses his final opportunity — an opportunity that is permanently extinguished once the season passes. There is no adequate remedy at law.

## CLAIMS FOR RELIEF

## COUNT I – VIOLATION OF THE SHERMAN ANTITRUST ACT § 1

91. Morton repeats and realleges each allegation set forth in Paragraphs 1 through 90 as if fully set forth herein.

92. Defendant NCAA, by and through its member institutions, has entered into an illegal agreement to restrain and suppress competition in the FBS Labor Market through the adoption and enforcement of the JUCO Eligibility Limitation Bylaws: NCAA Bylaws 12.02.6 (the Intercollegiate Competition Rule), 12.8 (the Five-Year Rule), 12.8.1 (the Eligibility Clock), 12.8.1.1 (the Eligibility Clock Extension), 12.8.3.1 (the Season-of-Competition Count), and 14.3.3 (the Three-Year Transfer Limitation). The relevant antitrust market is the market for NCAA Division I FBS football player labor services in the United States (¶¶56-64). The NCAA and its Division I member institutions exercise monopsony power as the sole meaningful purchasers of Division I FBS football labor.

93. This unlawful agreement among horizontal competitors has unreasonably restrained competition among institutions for the services of JUCO transfer athletes, including Morton. The Challenged Bylaws produce significant anticompetitive effects: they restrict market output, suppress compensation, foreclose JUCO transfers from the market, distort recruiting and transfer decisions, harm NJCAA member institutions, and reduce the quality of the Division I product available to consumers (¶¶65-75). No procompetitive justification is sufficient to justify the restraint (¶¶76-79). Less restrictive alternatives exist (¶¶80-81).

94. As a direct and proximate result of Defendant's conduct, Morton has suffered and continues to suffer antitrust injury — the loss of his fourth season of Division I football and its attendant NIL earnings, House revenue-sharing

payments, scholarship benefits, and professional pipeline opportunities (¶67). Morton's injury flows directly from the anticompetitive restraint and is of the type the antitrust laws were intended to prevent.

95. Defendant's conduct is ongoing and will continue to impose injury on Morton and other JUCO transfer athletes unless injunctive relief is granted. Morton seeks a preliminary injunction, a permanent injunction, a declaratory judgment that the Challenged Bylaws violate Section 1 of the Sherman Act, and an order enjoining enforcement of the Rule of Restitution (¶¶85-87).

96. Defendant's anticompetitive acts were intentionally directed at the United States market and have had a substantial and foreseeable effect on interstate commerce. Defendant’s anticompetitive acts resulted in unreasonable restraints of trade causing market-wide anticompetitive harm to the relevant labor market. For these reasons, Defendant has violated Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, entitling Plaintiff to injunctive relief both preliminary and permanent as well as monetary damages both treble and compensatory.

## COUNT II – TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

97. Morton repeats and realleges each allegation set forth in Paragraphs 1 through 90 as if fully set forth herein.

98. Morton has valid prospective economic relationships with third parties, including NIL marketing firms (BenX Worldwide and Innovative Marketing Group) (¶¶37-38), Division I institutions interested in his services as a graduate transfer (¶44), Temple University's revenue-sharing program (¶¶41-43), and professional football organizations and agents evaluating his NFL Draft prospects (¶¶45-48). These relationships are documented, active, and contingent on Morton's eligibility for a fourth season of NCAA Division I competition.

99. The NCAA has knowledge of these prospective relationships. The NCAA knows that its JUCO Eligibility Limitation Bylaws determine JUCO athlete eligibility and therefore access to the NCAA labor market, NIL marketplace, House revenue-sharing payments, and professional pipeline opportunities. The NCAA has been put on notice by multiple courts that enforcement of the Challenged Bylaws harms athletes economically.

100. The NCAA has intentionally interfered with Morton's prospective economic relationships by enforcing the Challenged Bylaws to render Morton ineligible for the 2026-27 season. This enforcement is purposeful and deliberate — the NCAA continues to enforce the JUCO counting rules despite multiple federal courts finding them anticompetitive. The NCAA's conduct constitutes improper interference: enforcement of rules that violate Section 1 of the Sherman Act constitutes improper means under Georgia law. The NCAA is a stranger to Morton's prospective economic relationships — it is not a party to Morton's NIL contracts, his representation discussions, his graduate transfer interest from other institutions, or his professional football prospects.

101. As a direct and proximate result of the NCAA's interference, Morton has suffered and will continue to suffer actual damages, including the loss of NIL earnings, House revenue-sharing payments, scholarship benefits, and professional opportunities.

**COUNT III – BREACH OF CONTRACT**

102. Morton repeats and realleges each allegation set forth in Paragraphs 1 through 90 as if fully set forth herein.

103. A valid contract exists between Temple University and the NCAA in the form of the NCAA membership agreement. Under this agreement, Temple and

all NCAA member institutions agree to abide by the NCAA Constitution and Bylaws as a condition of membership.

104. Morton is an intended third-party beneficiary of the NCAA membership agreement. The NCAA Constitution states that the organization exists to serve student-athletes, and the NCAA's Bylaws create specific rights and obligations governing student-athlete eligibility that are enforced directly against student-athletes. Morton must comply with these Bylaws as a condition of participation. The NCAA certifies student-athlete eligibility through the Eligibility Center, directly administering rules that determine Morton's eligibility and economic access.

105. The NCAA has breached its obligation to apply eligibility rules fairly and consistently. The JUCO counting methodology is arbitrary — it counts non-NCAA competition while exempting minor league, overseas, prep school, and club competition (¶24). Multiple federal courts have found the Challenged Bylaws to be unlawful restraints of trade (¶5). The Blanket Waiver, which waived the season count but not the Five-Year clock (¶¶50-51), demonstrates the internal inconsistency of the NCAA's own application of these rules.

106. As a direct and proximate result of the NCAA's breach, Morton has suffered and will continue to suffer damages, including the loss of his fourth season of Division I football and all attendant economic opportunities.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Javier Morton respectfully requests that this Court enter judgment in his favor and against Defendant, and grant the following relief:

1. A declaratory judgment that the Challenged Bylaws — NCAA Bylaws 12.02.6, 12.8, 12.8.1, 12.8.1.1, 12.8.3.1, and 14.3.3 — violate Section 1 of the Sherman Act, 15 U.S.C. § 1, as applied to Morton;

2. A preliminary injunction on an expedited basis enjoining the NCAA from enforcing the Challenged Bylaws against Morton pending final resolution of this action;

3. A permanent injunction enjoining the NCAA from enforcing the Challenged Bylaws against Morton;

4. An order directing the NCAA to certify Morton as immediately eligible for the 2026-27 Division I football season;

5. An order enjoining the NCAA from enforcing the Rule of Restitution (NCAA Bylaw 12.11.4.2) against Morton and any institution at which Morton competes, for any actions taken in compliance with orders of this Court;

6. Compensatory damages in an amount to be determined at trial;

7. Treble damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15;

8. Reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 15;

9. Pre-judgment and post-judgment interest; and

10. Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

## VERIFICATION

I, Javier Morton, am the Plaintiff in the above-captioned action. I have reviewed the foregoing Verified Complaint for Injunctive and Declaratory Relief. I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that:

1. The factual allegations in the Verified Complaint that are based on my personal knowledge — including those related to my athletic career, recruitment, academic enrollment, NIL agreements, eligibility status, and communications with teams, agents, and marketing firms — are true and correct, to the best of my knowledge, belief, and information.

2. The factual allegations in the Verified Complaint that are not based on my personal knowledge — including those related to NCAA Bylaw structure, market wide economic data, expert economic analysis, and the *House v. NCAA* settlement terms — are believed by me to be true based on the information, documents, and expert reports provided to me by my counsel and identified in the foregoing Verified Complaint and provided herewith in the cited supporting Exhibits A to Z.

Executed this 17th day of March, 2026.

*/s/ Javier Morton*
Javier Morton

* * *

Respectfully submitted this 22nd day of March, 2026.

THE FIELDS FIRM LEGAL

*/s/ Ronald M. Fields III*
Ronald M. Fields III, Esq.
Georgia Bar No. 426256
The Fields Firm Legal
Tel: (404) 981-5715
791 Myrtle St NE
Atlanta, GA 30308
ron@fieldsfirmlegal.com
*Counsel for Plaintiff*